FILED

2023 May-09  PM 02:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| JESSICA IVEY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )    Civil Action No. 5:21-CV-1053-CLS |
| | ) |
| CRESTWOOD   MEDICAL | ) |
| CENTER, | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Jessica Ivey was employed for a brief period, from March to July 2020, as a nurse at Crestwood Medical Center in Huntsville, Alabama. She alleges that she was discharged because of her race, Asian,[1] subjected to a racially hostile work environment,[2] and terminated in retaliation for complaining about the discrimination she perceived.[3] This opinion addresses defendant's motion for summary judgment.

The Federal Rules of Civil Procedure provide that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[1] *See* doc. no. 1 (Complaint), ¶¶ 47-60 ("Count I - 42 U.S.C. § 1981 Discharge").

[2] *Id*. ¶¶ 61-71 ("Count II - Title VII Race Hostile Work Environment"), and ¶¶ 72-82 ("Count III - 42 U.S.C. § 1981 Hostile Work Environment").

[3] *Id*. ¶¶ 83-96 ("Count IV - Title VII Retaliation"), and ¶¶ 97-111 ("Count V - 42 U.S.C. § 1981 Retaliation"). The complaint also "seeks legal and equitable relief for the defendant's retaliatory discharge in violation of Ala. Code § 25-5-11.1." Doc. no. 1 (Complaint), ¶ 2. That statement appears to be a scrivener's error, because the cited statute prohibits the termination of a worker's employment for bringing an action for worker's compensation benefits, which is not at issue here. *See* doc. no. 29-1 (Plaintiff dep.), at 223-24.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper, "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

*reasonable* inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (emphasis supplied)

(quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference

is not reasonable if it is only a guess or a possibility, for such an inference is not

based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks*

*Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).

Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  *A genuine issue of material fact* does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration and emphasis

supplied).

# I.  SUMMARY OF RELEVANT FACTS

Plaintiff began her employment with Crestwood Medical Center[4] as a staff nurse in the Emergency Department on March 3, 2020.[5]  That was one week before the World Health Organization declared the COVID-19 virus to be a pandemic.[6]  Day shifts in the Emergency Department began at 7:00 a.m. and ended at 7:00 p.m., and night shifts accordingly ran from 7:00 p.m. until 7:00 a.m. the following morning.[7] Plaintiff, however, worked twelve-hour "split shifts" on Fridays, Saturdays, and Sundays — initially from 1:00 p.m. until 1:00 a.m., but later from 3:00 p.m. until 3:00 a.m.[8]  She reported to the day-shift "charge nurse" for the first half of each split shift, and to the night-shift charge nurse for the remainder.[9]  Charge nurses supervised operations on their shifts — monitoring patient care, allocating resources, and organizing patient flow — but did not possess disciplinary authority over staff nurses. During plaintiff's tenure, Taylor Fawcett was the day-shift charge nurse, and Tina Simon was in charge of the night shift.[10]

---

[4] Crestwood Medical Center is owned by Community Health Systems:  an entity that  is not a party to this action.  *See* doc. no. 29-8 (Holtzclaw dep.), at 113-14.

[5] Doc. no. 29-1 (Plaintiff dep.), at 28-29.

[6] *See* https://www.cdc.gov/museum/timeline/covid19.html.   The declaration was made on March 11, 2020.

[7] Doc. no. 29-11 (Simon dep.), at 11-12.

[8] Doc. no. 29-1 (Plaintiff dep.), at 57, 60, 156.

[9] Doc. no. 29-1 (Plaintiff dep.), at 60.

[10] Doc. no. 29-11 (Simon dep.), at 12-13.

Plaintiff contends that, from the beginning of her employment, Tina Simon treated her differently than other nurses on the night shift.[11]  On one occasion, Simon "joke[d] that [COVID] was a China virus," and then looked at plaintiff and rolled her eyes.[12]  Plaintiff considered the remark to be racially offensive, and complained to either Bob Phillips, Director of Crestwood's Emergency Services, or John Crow, Manager of the Emergency Department.[13]

In addition, plaintiff contends that Simon subjected her to "many, many" indignities on virtually a daily basis.[14]  For example, Simon allegedly would:  not respond when plaintiff signaled a need for assistance with a patient;[15] assigned plaintiff to the "COVID hall" more than any other nurse;[16] paged plaintiff on the hospital's overhead speaker system and said "things that weren't appropriate" to be heard;[17] told plaintiff's co-workers "not to trust [plaintiff's] clinical judgment"; and spoke to plaintiff in a "demeaning manner" in the presence of patients and co-

---

[11] Doc. no. 29-1 (Plaintiff dep.), at 78-79.

[12] Id. at 81, 83 (alterations supplied).

[13] Id. at 82.  Neither Bob Phillips nor Tina Simon was questioned about this comment.

[14] Id. at 91.

[15] In hospital jargon, this was called "hitting the call light."  Id. at 98-99.

[16] Id. at 90.

[17] Doc. no. 29-1 (Plaintiff dep.), at 129-130; id. at 131 ("One time one of my patients was like are you the only person working in ER because I hear your name every two seconds overhead for things that I don't feel should be called overhead.").

workers.[18]

Simon also became angry when plaintiff missed "safety huddles":  a meeting held at the beginning of each shift, during which the charge nurse relays new information or protocol changes.[19]  Staff nurses were expected to attend the huddle, and to acknowledge receipt of the information conveyed by signing an attendance sheet.[20]  Plaintiff did not attend any night-shift safety huddles, but explained that she, instead, engaged in a "one-on-one huddle" with the day-shift charge nurse when she arrived for the first half of her split-shift.[21]

On one occasion, Simon became angry with plaintiff for taking her lunch break while Simon conducted the night-shift safety huddle.[22]  Plaintiff explained that she

> was at lunch during the [time that Simon conducted the night-shift] huddle.  I got there at 1 [p.m.], [and Simon] got there at 7 [p.m.].  I was met in the hall by a very angry Tina Simon, which she did not — I mean, she didn't shy from the fact that I was not someone that she really liked. And she put her finger in my face and told me to shut it and not speak. And she said that I didn't make it to huddle and that from now on I would make it to huddle.  And that — she said that I would have a scheduled lunchtime from now, and it would be when she was good and settled and ready when she arrived at 7 p.m.

---

[18] Doc. no. 29-1 (Plaintiff dep.), at 90-91.

[19] *Id.*; doc. no. 29-11 (Simon dep.), at 14-15.  During plaintiff's brief tenure, protocols changed frequently due to the increasing number of COVID infections.

[20] Doc. no. 29-11 (Simon dep.), at 14.

[21] *Id.* at 55; doc. no. 29-1 (Plaintiff dep.), at 94-95.

[22] Doc. no. 29-1 (Plaintiff dep.), at 95-96.  The date of this event is not contained in the record.

Doc. no. 29-1 (Plaintiff dep.), at 96 (alterations supplied).  Plaintiff contends that the

foregoing exchange reflected Simon's racial bias toward her.[23]

Aside from a verbal reprimand, however, plaintiff was not otherwise

disciplined for missing Simon's huddle.  Even so, plaintiff sent the following email

message to Bob Phillips and John Crow on June 12, 2020:

> I wanted you all to know that I am not someone to start issues at work.
> I do not like confrontation[.]  I do not like having to involve our bosses
> in things as I'm aware it is unnecessary stress.  So I apologize that I'm
> having to bring this up but I have met my threshold for being bullied and
> singled out and targeted.  When I started working here it was in the
> beginning of this pandemic.  Bc [Because] every ER is the same —
> because they all practice best care — sepsis is sepsis no matter where
> you go so is Stroke, MI and so on.  I didn't mind being taken off of
> orientation and it was because I am a good ER nurse I know how to
> prioritize patient care and safety and do so in a timely manner.  If you
> ask my coworkers from the other ER I am still employed at they will tell
> you I have a good work ethic, I have never been written up, I have a
> good attitude and I don't mind hard work.  I've worked there 6 years —
> never cried even at some of the most brash comments because I am thick
> skinned and I understand the culture of the emergency room.  But I have
> never been bullied to this extent.  I've never been talked down to and
> berated in front of staff I barely know.  I've never been talked about
> within earshot of patients.  I've never been made to feel inadequate and
> not intelligent or that I don't belong where I work.  *I don't know what
> or why Tina wants to target and single me out*.  I've never been
> insubordinate.  She's never written me up.  I've gone out of my way to
> ask what I could do to be a better nurse for her liking.  I've never been
> rude, unkind or dismissive.  *When anyone is being bullied or singled out
> as I have* [been,] *you begin to question what is different about you that
> makes someone treat you this way without cause.  I don't want to guess
> as to why someone has a motive but I wonder if it's because I'm*

---

[23] *Id.* at 97.

*Korean?  Or if she just has someone else's opinion of me?  I'm unsure*.
But I can not come to work and be bullied anymore.  I also can not
afford to change shifts if it will affect my pay so changing is not an
option if my pay has to change I know that would be an awesome way
solution and I hate that I even have to say that.  I would be willing to
despite pay if it wasn't necessary.  A leader in the Er sets the tone for the
entire crew the entire shift.  They're [*sic*] attitude can and will make and
break the Shift.  I am told I'm not the first nurse to mention this — not
only at this hospital but others as well.  A nurse before me quit without
notice due to the bullying and I am not going to quit.  Even if it's
humiliating and it makes me anxious because this isn't micromanaging
this is someone blatantly pushing me and being passive aggressive and
mean in front of Coworkers who barely know me.  I can't go to the
bathroom without letting 5 people know so she doesn't come to the door
looking for me.  I am called overhead over and over for things no one
else is.  I've heard them tell other coworkers that I don't know what I'm
doing or that I am not adequate.  I've been berated but last weekend
when she told all the charges I am to go to a scheduled lunch time she
provided — I'm the only employee in the department with a scheduled
time now.  I am an ER nurse I am aware that I may not get lunch or
breaks somedays and I'm okay with that.  Patient care will always be my
priority when I am at work.  I don't know what I did to deserve this type
of public humiliation or harassment but I do not know what to do
anymore.  I try to stay out of the way.  I've had housekeeping, security,
even another RN who knew me before I worked here asked me why they
were treating me like they were — they said it was obvious and they
were treating me like I was stupid.  When there has been a critical
patient — I've tried to come in to help but my help is not needed.  I do
not feel comfortable.  This is the third time this  has been brought up and
every time there is an excuse or there is no change.  This is not being
brash.  This is bullying and blatantly singling me out.  *Attached is a
message I sent to them with their response*.  Thanks for your time and
once again I apologize for the trouble and I wish I didn't have to bring
this up.

Doc. no. 29-1 (Plaintiff dep.), defendant's ex. 10, at ECF 145-46 (alterations and

emphasis supplied).[24]  The "message" referenced as "attached" in the next-to-last line of the foregoing email was a copy of one posted by plaintiff to Simon's Facebook account on Saturday, May 23.  In it, plaintiff apologized for missing the safety huddle "yesterday," and expressed her willingness to receive guidance from Simon.[25]  Simon responded:

> Wow girl.  Please don't worry.  I'm here to help if you need it.  Please

---

[24] **NOTE**: "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[25] A copy of the Facebook message is found at doc. no. 29-1 (Plaintiff dep.), defendant's ex. 10, at ECF 138-42.  The relevant portions read as follows:

> Hey, sorry to bother you.  I wanted you to know that I'm sorry I missed huddle yesterday[.]  I planned to come but had another patient who had orders after I took the one upstairs who was admitted.  I do respect you, I never want you to think I do not.  You are a good person, I can see that and I know you do what is in the best interest for me, the patients and our ER as a whole.  I can see that.  I want you to know I value your opinion and what you have to say or teach me because I know you're [sic] experience in nursing and knowledge is long before mine.  I maybe don't seem to be hustling – but I do hustle and give the best care and do not ever want to do anything to jeopardize anyone's life.  I enjoy being a nurse & I hold that title to the standard of care any nurse should.  I don't know why the majority of my patients are either gravely ill or very confrontational or demanding.  I don't mind working hard.  I have a good work ethic.  I hope you're able to know that with confidence in the near future.  I do not think I know everything[.]  I don't think I ever will be able to think that.  I'm willing to learn and grow as a nurse, which [is] why I came to [C]restwood.  * * * * *  *I also am having to retrain my brain to not do back charting and to chart as I go and I am trying hard to do that.*  If you're able to[,] please be patient with me while I am retraining some things that are instilled in me from working in a different ER.  I know how to prioritize patient care and I do have the skills to do so.  I am a good nurse.  I know how to think critically and I know the processes and what's needed for the patient care and safety.  But I would be foolish to assume I could know more than anyone with your experience and knowledge.  [Alterations and emphasis supplied.]

8

don't listen to anyone else either.  If you have a problem or questions
come to me.  I'm here for you.  I'm sure you're gonna be fine.  Last
night was busy.  You're not gonna get to come to huddle all the time.
I understand that[,] but I need to let you know what's new[;] that's my
job.  See ya soon.  Stop worrying about me.  Just take care of your
patients.  You're gonna be fine.

*Id*. at ECF 142-43 (alterations supplied).[26]

Phillips and Crow met with plaintiff on June 12, the same date as her email, to
discuss her concerns.[27]  When addressing plaintiff's complaint that Simon "micro-
managed" her, Phillips explained that *he* had asked all charge nurses to closely
monitor staff-nurse charting practices, to ensure that patient charts were completed
in "real time," and not "back charted."[28]  In other words, Phillips explained that
plaintiff's charting practices were not being "singled out" for scrutiny.[29]  Phillips also
expressed his belief that Simon was not a "racist."[30]

Phillips assured plaintiff that he would investigate her complaints, and she
provided him the names of four co-employees who, she believed, may have witnessed

---

[26] *See also* doc. no. 29-2, defendant's ex. 10, at ECF 1-2 (second copy of Simon's response).

[27] Doc. no. 29-1 (Plaintiff dep.), at 133.

[28] Doc. no. 29-9 (Phillips Sept. 23, 2020 dep.), at 62-65; doc. no. 29-15 (Phillips aff.) ex. A, at ECF 7.

[29] Doc. no. 29-9 (Phillips Sept. 23, 2020 dep.), at 64-65.  Observe that, in plaintiff's June 12 email to Phillips and Crow that is quoted in text, *supra*, she admitted that she was "having to retrain my brain to not do back charting and to chart as I go . . . ."

[30] Doc. no. 29-1 (Plaintiff dep.), at 133-34.

Simon's allegedly discriminatory behavior.[31]  Nevertheless, Phillips also warned that

the process might "take a little bit to get completed."[32]

Phillips met with Simon the following Monday, June 15.[33]  He summed up their

meeting and later events in his deposition:

> When I talked to [Tina Simon] on June the 15th she told me that
> she had indeed paged [plaintiff] overhead, but she had paged other
> people.  She told me that she had been finding things in her chart and
> taken those directly to her because that's when she brought up again that
> she's not marking her meds.  That they had been prepared and she was
> showing that the charts were opened, that they had been documented
> and that was the only way she could tell that they had done their
> assessments and things like that.  And she said that she was very direct
> in her conversations with people[34] and she understood — she didn't
> want Jessica to think she was — she was singling her out, essentially,
> and she wanted the opportunity to talk to her and see if they could make
> it work because she said, directly, I really want her to stay.  I want her
> to do well.
>
> And so she wanted the opportunity to talk to her the next
> weekend.  The next weekend would have been the 19th.  That was why
> I did not talk to the staff yet because I wanted her to have the
> opportunity, as I did with my other leaders, to try to work it out directly
> with them first.
>
> So I met with Tina [Simon] again on . . . June the 22nd, the next
> Monday, which would have been the weekend after she talked to her,

---

[31] Doc. no. 29-1 (Plaintiff dep.), at 134.  Plaintiff identified Ken McGuire, "Alaina," "Athena [Jenkins]," and "Karen" as witnesses.  Doc. no. 29-15 (Phillips aff.), ex. A, at ECF 7.

[32] Doc. no. 29-15 (Phillips aff.), ex. A, at ECF 7.

[33] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 84-85.

[34] Simon self-characterized her communication style as "abrupt."  Doc. no. 29-11 (Simon dep.), at 33.

and she told me, she goes, We got to talk a lot of stuff out and we had a decent weekend, we had a much better weekend.  And she thought it was going to improve.

And so at some point during that week there was either a text or a communication between Jessica [the plaintiff] and John [Crow], I don't know if he called her, or if she called him, or if he called her because they were working on scheduling things.  But he said that she mentioned the previous weekend was a little better.

So I chose not to go forward and talk to any of the staff at that point because I wanted to give it an opportunity to see if it was going to be better on the shift for them.

Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 84-85 (alterations and ellipsis supplied).

Phillips did not question Simon about plaintiff's speculation that Simon may have treated her differently because of her race.  In fact, Phillips denied knowing that plaintiff claimed to be Korean until reading her June 12 email:[35]

The first time I heard anything about her being Korean was in an e-mail to me because I didn't know she was Korean, to be totally honest, until this came up because she — her body build and stuff — I would have never picked it out, I just didn't know it.

Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 59.

In like manner, Simon insisted she "had no idea, none whatsoever," that

---

[35] Plaintiff stated in her June 12 email to Phillips and Crow that she did not "want to guess as to why someone has a motive [to single me out for harassment or bullying,] *but I wonder if it's because I'm Korean?*"  Doc. no. 29-1 (Plaintiff dep.), defendant's ex. 10 (June 12, 2020 email), at ECF 145-46 (emphasis supplied).

plaintiff was Asian until this action was filed:

> Q.   And Ms. Ivey is Asian, right?
>
> A.   Pardon me?
>
> Q.   Ms. Ivey is Asian?
>
> A.   Well, I found that out after our deposition thing,[36] I didn't know that before.
>
> Q.   You didn't know she was Asian?
>
> A.   No, I had no idea.
>
> Q.   And so from your perspective she doesn't present as an Asian person, she doesn't look like —
>
> A.   — no, not at all, no.
>
> Q.   Not at all?
>
> A.   Not to me.  I never knew she was — I swear on a stack of Bibles I never knew she was Asian until the first deposition I had with these guys[37] where she said that I was discriminative [*sic*] against her because she was Asian, no, wrong.
>
> Q.   But you heard about it earlier, right —
>
> A.   — no, no.
>
> Q.   — at the deposition?  You didn't know that she was accusing you of discrimination?

---

[36] Ms. Simon was technically incorrect when referring to a "deposition"; the record reflects that the occurrence actually was Simon's first conference with defendant's attorneys.  *See* doc. no. 29-11 (Simon dep.), at 44-47.

[37] Defense counsel.  *Id*.

A.   Not until I had my first deposition in Hartselle, that was the first
time I heard about it.

Doc. no. 29-11 (Simon dep.), at 43-44; *see also id.* at 52-53 ("I'm telling you – I don't

know why you keep bringing that up, but I did not know she was Asian until I was

told that whenever I met with the lawyers.  I had no idea, none whatsoever. . . .  I did

not know she was Asian, Korean, Japanese, whatever she is until last year, period,

no.").

After meeting with Phillips, Simon "pulled [plaintiff] aside" at the beginning

of the next weekend split shift, and apologized for making her feel "that [she] was

bullying her or picking on her," and assured plaintiff that "it was not meant to be that

way."[38]

Simon believed that her apology had "resolved" the rift in her relationship with

plaintiff.[39]  She told Phillips that her dealings with plaintiff during the remainder of

the June 19-21 weekend shifts had been "much better."[40]   Regardless, any

improvement was only transitory.  Simon reported to Phillips on Monday, June 29,

that conflicts with plaintiff had recurred during the preceding weekend shifts, and she

was "really struggling":  she did not "feel like [she could] say anything to Jessica

---

[38] Doc. no. 29-11 (Simon dep.), at 49 (alteration supplied).

[39] *Id.* at 51-52.

[40] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 85.  Plaintiff's assessment may not have
been as positive.  John Crow told Phillips that plaintiff had told him that relations with Simon over
the same weekend had been only "a little better."  *Id.*

without her getting upset"; and she did not "know how to deal with" the situation.[41]

Consequently, that same day, Emergency Department Manager John Crow sent a text to plaintiff asking whether she could meet with him and Phillips the following Wednesday, July 1.[42]  Plaintiff was not able to meet on that date due to child care conflicts, but offered to meet before the beginning of her shift on Friday, July 3.[43]

The morning before that Friday meeting, Phillips and Crow received another lengthy email message from plaintiff.[44]  The message read, in part, as follows:

> Below are some of the things that have given [me] the perception that I am being targeted or bullied along with my other complaints:
>
> I also get the perception that maybe I would be best to just let all of it go.  I get this perception because I felt as though the first time we met I was told your perception of Tina and was told a formal investigation would take place and you said you'd talk to the individuals I had said that witnessed the bullying and targeting & some of them have asked if you all had planned to talk to them because they were bothered by what they witnessed and they still haven't heard from anyone and I am confused because it's been 3 weeks and I haven't heard anything.  I was giving you all time to do whatever was needed.  Tina did apologize I accepted it but she then continued to do things two days after apologizing.  This isn't just me being humiliated in front of my new coworkers.  Being laughed at and ridiculed.  It's made the perception of

---

[41] *Id.* at 86.  The textual quotes are carved from the following statements:  "And then the Monday morning, the 29th, after that weekend when I was meeting with Tina [Simon], that's when she said at that point, Okay, this was not a good weekend, it was — she said, I'm really struggling, I don't feel like I can say anything to Jessica without her getting upset with me and I don't know how to deal with this."  *Id.*

[42] Doc. no. 29-2 (Plaintiff dep.), defendant's ex. 11, at ECF 3.

[43] *Id.*

[44] Doc. no. 29-3 (Plaintiff dep.), defendant's ex. 16, at ECF 5.

> me to some of my new coworkers swayed and I'm unsure how to change
> that other than to show them I'm competent and know how to be a nurse.

Doc. no. 29-3 (Plaintiff dep.), defendant's ex. 16, at ECF 5 (alteration supplied).

Plaintiff described in detail events that occurred during the shift that ended in the

morning hours of Monday, June 27, but did not specifically complain about her

interaction with Simon.[45]  She also alleged for the first time that, at 7:03 p.m. on May

24, Simon had "smacked [her] on the butt" and said "get to work.  When I say slap

I mean reared back and slapped . . . ."  Id.[46]

Plaintiff then described four incidents that had occurred on Friday, June 26,

and which she thought demonstrated that Simon was ignoring her requests for

assistance and antagonizing her.[47]  She concluded the email as follows:

> Some of these things would not bother me [because] I get that I'm not
> her favorite employee but this is done in front of people.  And I don't
> understand because I feel a leader should be there to assist and ensure
> patient safety and be a leader to the nurses.  I maybe am misguided and
> have the wrong perception of what is it to be a ER charge nurse.  I have
> more things that have occurred with times and dates if you'd like me to
> send them too.  Sorry for taking up so much time & I appreciate your
> willingness to help.

Id. at ECF 6 (alteration supplied).

---

[45] Id.

[46] The textual quotations were carved from the following statements:  "May 24 — 19:03 [Military time; 7:03 p.m. civilian time] nurses station next to doctors box and unit clerk — [I] was smacked on the butt by Tina.  I asked what that was for and she said get to work.  When I say slap I mean reared back and slapped it startled me."  Id.

[47] Id.

Phillips was concerned by the tone of plaintiff's message.  He perceived that she was very upset.[48]  Accordingly, he decided to review video footage of the area where Simon allegedly "smacked [plaintiff's] butt," and to interview staff who then were on duty.[49]  He reviewed video footage for the location ("nurses station next to doctors box and unit clerk") and time specified by plaintiff ("19:03 hours"), but it did not corroborate her report.[50]  Even so, he spoke with Pam Walls:  a staff nurse who was stationed at the unit clerk desk when the incident allegedly occurred.  Walls told Phillips that she did not see or hear Simon slap plaintiff, and that she had not witnessed any unprofessional behavior between them.[51]

Phillips's "Timeline for Meetings with Jessica Ivey, RN" reflects that he also spoke about Simon's alleged discriminatory conduct with three of plaintiff's co-workers:  Athena Jenkins, Heath Frank, and Taylor Fawcett.[52]  Phillips summarized those conversations as follows:

> 1. Athena Jenkins — I explained to Athena that I was investigating a complaint and she was listed as a witness to the behavior.  I asked her if she ever witnessed any unprofessional behavior between Tina

[48] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 105-11.

[49] *Id.* at 111; doc. no. 29-15 (Phillips aff.), ex. A, at ECF 9.

[50] Doc. no. 29-15 (Phillips aff.) ¶ 6.

[51] *Id.*, ex. A, at ECF 9.  Simon testified that she did not slap plaintiff.  Doc. no. 29-11 (Simon dep.), at 85.

[52] Doc. no. 29-15 (Phillips aff.), ex. A, at ECF 9.  With the exception of Athena Jenkins, Phillips did not interview any of the other employees identified by plaintiff as persons who might have witnessed Simon's allegedly discriminatory behavior.  See note 30, *supra*.

16

Simon and Jessica Ivey.  She stated:

a. "At first I thought Tina was monitoring her closer than everyone else.  But as time went on I could see why . . . it was warranted."  "Jessica is unsafe."  I asked her to explain that statement:

b. "I didn't recognize it at first but then I realized that Jessica was creating [medication] discrepancies and asking me to witness the correction of the discrepancy with her."  "I thought that it was kind of odd that she knew how to clear them herself."  "I don't remember how many."

c. "I am not sure about her giving meds to my patients."  "I don't want her to give my patient medications."  I asked do you feel that she is safe for patient care?  Athena answered "No."

\* \* \* \*

3. Heath Franks — I asked Heath what his concerns were with Jessica Ivey.  He stated "She's acting just like me when I was using."  I asked him to explain.  He stated that she is very "paranoid, not keeping up and asks for help a lot."  He said that is exactly how he acted when he was using and diverting [medication].  (Heath is currently on the V-Dep program[53] and a very open mentor and coach for staff that struggle).  She is "sweating all the time for no reason.  It's actually kept pretty cold in the ED and she's sweating."  Heath stated that there was a recent incident with her and diluting a Dilaudid.  He said that he walked into the med room and she was diluting a Dilaudid in a 10 ml syringe.  He looked at her and the syringe in passing but didn't say anything.  He said that she became very defensive and started telling him that she always diluted her Dilaudid.  I asked him if he ever witnessed any unprofessional behavior between Tine [sic] and her and he stated that "Tine [sic] has to tell her to do stuff all the time because she's not keeping up."

---

[53] This term refers to a voluntary drug program administered by the Alabama Board of Nursing which allows a nurse to self-report as a drug user.  *See* doc. no. 29-9 (Phillips Sept. 23, 2020 dep.), at 163.

4. Taylor Fawcett — Weekend Dayshift Charge Nurse — stated that Jessica is very "scattered" and is not able to keep up at all on the shift. She stated that she frequently came up missing and stayed in the bathroom forever when she went (stated "sometimes over 30 minutes"). She stated that Jessica was often acting paranoid and that she had to have people help her keep up a lot. Taylor stated that her staff had complained about having to help her and do her work. Taylor stated that she has concerns about her patient care.

Doc. no. 29-15 (Phillips aff.), ex. A, at ECF 9-10 (alterations supplied; first ellipsis in original).

Following his investigation, Phillips checked the records from the "Omnicell" automated medication management system to determine whether there had been discrepancies in plaintiff's medication count.[54] In his view, the Omnicell records from March 1 through July 3 indicated that plaintiff "had created some discrepancies."[55]

Phillips believed further action was warranted; and so he contacted Susan Bryce (Chief Nursing Officer) and David Brown (Director of Human Resources). He

---

[54] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 115, 121. In order to dispense a medication, a nurse enters the name of the drug and dosage on the touch screen of the "Omnicell." *See, e.g.*, https://www.omnicell.com/point-of-care (last visited May 3, 2023). The Omnicell prompts the nurse to count the number of doses in the bin before removing a dose. If the amount counted differs from the previously recorded count, a discrepancy record is created. *See* doc. no. 29-11 (Simon dep.), at 98, 102. Discrepancies must be resolved by two nurses. Doc. no. 29-10 (Phillips Oct. 14, 2022 dep.), at 16.

[55] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 121; doc. no. 29-10 (Phillips Oct. 14, 2022 dep.), at 43; doc. no. 29-15 (Phillips aff.), ex. A (Fitness for Duty/Reasonable Suspicion Testing Checklist), at ECF 10.

briefed them on plaintiff's June 12 complaint and subsequent events.[56]  Bryce and

Brown agreed that Phillips should meet with plaintiff on July 3, as scheduled; explain

his findings to her; request that she submit to a drug screen based on "reasonable

suspicion"; and, place her on administrative leave pending results.[57]

Phillips completed a "Fitness for Duty/Reasonable Suspicion Testing

Checklist" form that contained the following introductory language:

> This checklist is to be completed by the supervisor/department head
> involved to help determine whether or not an employee will be tested for
> current impairment from Substances.  This checklist must be completed
> before requesting that an employee submit to a Substance test.  If an
> employee smells of alcohol, he/she will be tested immediately on that
> basis alone.
>
> Substance use must be suspected in order to test.   Genetic or
> handicap/disability information is not being sought.  Testing will not be
> conducted on the basis of performance issues only.

Doc. no. 29-15 (Phillips aff.), ex. A, at ECF 14.  Phillips checked the following boxes

on the form: disappearance from work area; more time needed to complete job; erratic

and disoriented actions; hostile, crying, talkative; dramatic change in physical

appearance; and, incorrect narcotics count.[58]  He also noted "multiple complaints of

---

[56] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 108.

[57] Doc. no. 29-15 (Phillips aff.), ex. A (Fitness for Duty/Reasonable Suspicion Testing Checklist), at ECF 10.

[58] *Id*. at ECF 14.

'paranoid behavior' for no reason from co-workers."[59]   Emergency Department Educator Chris Darnell signed the form as a witness.[60]

Plaintiff reported to the meeting with Phillips and Darnell prior to the beginning the first half of her split shift on Friday, July 3.  Plaintiff recalled that Phillips told her of his conversation with Simon, and stated that Simon had admitted "most of [plaintiff's] claims of discrimination."[61]  Plaintiff said that Phillips had cited Simon's admissions as the basis for electing not to interview all of the co-employees who plaintiff identified as possible witnesses.[62]   Phillips, on the other hand, memorialized their meeting in his "timeline" as follows:

> At 2 pm Chris Darnell and I met with Jessica in my office.  She was already visibly upset when she arrived.  She said that she had nausea and thought that she had a virus.  She immediately began rapid talking, sounding extremely defensive and jumping from one subject to another before we started our conversation.  I apologized for not meeting with her last Friday.  She immediately began rapid speech, stating that "I have called the three people that I asked you to meet with and you didn't meet with any of them."  I tried to explain more than once that I didn't need to meet with them initially because when I talked to Tina that *she corroborated that she was watching* [*plaintiff*] *closely and that she did have concerns of* [*plaintiff*] *not getting work done and that she did page her overhead multiple times* so it wasn't necessary.  Jessica was extremely upset and kept going back into discussion and about her situation and that we didn't discipline Tina and that she was targeting

---

[59] *Id.*

[60] *Id.*

[61] Doc. no. 29-1 (Plaintiff dep.), at 144.

[62] *Id.*

her and was discriminating against her because she was Asian.  I tried
to explain that I could not discuss what was or wasn't done related to
another employee.  I then tried to explain that she was showing signs of
erratic, paranoid behavior, creating discrepancies in the Omnicell when
removing controlled substances and correcting them, and that I had
received complaints of her coming up missing off the unit and staying
in the bathroom for long periods of time.  I tried to explain that I needed
to do an investigation so we were going to have her do a drug screen and
do an administrative suspension.  I explained that it wasn't discipline
and that if the investigation resulted as clear she would receive all of her
pay including shift diff[erential] and weekend differential.  She became
angry and was crying.  I asked Chris to escort her to the Lab for her drug
screen and he left with her.

Doc. no. 29-15 (Phillips aff.), ex. A ("Timeline for Meetings with Jessica Ivey, RN"),

at ECF 10 (alterations and emphasis supplied).

Before submitting to the drug test, plaintiff called Community Health System's

"corporate" reporting hotline.[63]  The record of that call, placed at 4:53 p.m. on July

3, 2020, indicates that plaintiff reiterated her complaints of mistreatment at the hands

of Tina Simon, and her belief that she had been subjected to discriminatory treatment

because of her Korean heritage.  Plaintiff also stated her belief that the drug screen

was an act of retaliation for her complaints.  The hotline call was summarized as

follows:

Ms. Ivey stated [that,] since March 2020, she has been targeted and
harassed by Tina Simon, charge nurse.  Ms. Ivey stated Ms. Simon often

---

[63] Doc. no. 29-1 (Plaintiff dep.), at 150.  As stated in note 4, *supra*, Crestwood Medical
Center is owned by Community Health Systems: an entity that is not a party to this action.  *See* doc.
no. 29-8 (Holtzclaw dep.), at 113-14.

21

refuses to assist her.  Ms. Ivey stated on May 24, Ms. Simon slapped her on the buttocks.  Ms. Ivey stated in June (exact date unknown), Ms. Simon startled her during a medication count, and suggested drugs might be the reason for her drug count errors.  Ms. Ivey stated she and Ms. Simon performed the drug count, which was reconciled.  Ms. Ivey stated Alaina Peterson, RN, overheard Ms. Simon's drug remark.  Ms. Ivey stated [that] she suspected she was being singled out because she is the only Korean in the department.  Ms. Ivey stated [that,] on June 12, she met with Bob Phillips, ER director, about Ms. Simon.  Ms. Ivey stated Mr. Phillips said Ms. Simon was his best charge nurse, and he did not believe she was racist.  Ms. Ivey stated Mr. Phillips presented her with a coaching, which contained false allegations made by Ms. Simon (details withheld).  Ms. Ivey stated she signed the coaching, and asked Mr. Phillips to speak to Brad Hammond, RN, Erin Vaughn, RN, Karen (last name unknown), housekeeper, and Ms. Peterson, who could verify Ms. Simon's allegations were false.  Ms. Ivey stated on July 3, she was called into a meeting with Mr. Phillips and Chris Darnell, educator.  Ms. Ivey stated Mr. Phillips stated the investigation was complete.  Ms. Ivey stated Mr. Phillips said he did not question the employees, because Ms. Simon admitted to targeting her.  Ms. Ivey stated during the meeting she made Mr. Phillips aware on June 26, Ms. Simon delayed patient care, by ignoring her request for assistance with starting an IV.  Ms. Ivey stated [that,] during the meeting, she made Mr. Phillips aware on June 27, her patient assessment of a patient having a stroke, and needed a CT scan was ignored by Ms. Simon, Will (last name unknown), nurse practitioner, and Dr. Edwards.  Ms. Ivey stated two hours later, an order was immediately written when Sherri Swaider, nurse, provided the same stroke assessment.  Ms. Ivey stated Mr. Phillips continued the meeting, by indicating the incident of May 24, was being dismissed because security cameras did not capture Ms. Simon hitting her on the buttocks.  Ms. Ivey stated she was placed on administrative leave.  Ms. Ivey stated she was required to take a drug test, in order to rule out drugs being the cause of the drug count discrepancies, and for her erratic behavior.  Ms. Ivey stated Mr. Phillips said he is going to audit her charts.  Ms. Ivey believes being placed on administrative leave was an act of retaliation by Mr. Phillips.  Ms. Ivey stated she does not trust her drug test will be properly handled.  Ms. Ivey stated she is willing to pay for a private

entity to perform her drug test.  Ms. Ivey requested to be contacted about her concern.

Doc. no. 29-14 (Holtzclaw aff.), ex. A (Records of Crestwood Reporting Hotline), at ECF 8-9 (alterations supplied).  After that call, plaintiff submitted to the drug test. Darnell then escorted plaintiff to her vehicle.[64]

Later that day, plaintiff sent a text message to Phillips, explaining her perspective on the perceived drug-discrepancy issue, and complaining about Phillips's investigation (or lack thereof) of plaintiff's initial complaint.[65]  She told him that she felt she was "in a hostile work environment because I have been singled out, bullied and targeted and nothing was done.  I went through the proper chain of command and I was the one who was coached and now I am being accused of diverting."[66]

Plaintiff sent Phillips a text message the following day, July 4, and stated that Simon had told her co-workers that she was not *sick*, but on *leave*, and that she thereafter had received calls from co-workers asking her why she was on leave.[67]  She expressed concern about the lack of confidentiality regarding the circumstances of her

---

[64] Doc. no. 29-1 (Plaintiff dep.), at 150.

[65] Doc. no. 29-2 (Plaintiff dep.), defendant's ex. 13, at ECF 12-15.

[66] *Id.* at ECF 15.

[67] *Id.* at ECF 16.

absence, and stated that her reputation had been "tarnished."[68]

Rather than replying to plaintiff, Phillips called Lanette Holtzclaw, Crestwood's human resources manager, and advised her of plaintiff's text messages.[69] Holtzclaw then called plaintiff, who recalls that Holtzclaw said

> she was Lanette from HR, and told me that if I knew what was best for me, I would not speak to anyone at Crestwood Hospital because I was diverting and I needed to not do that. And I tried to explain my side of it, and she said, oops, I don't want to hear it, I don't want to hear it, stop contacting people from Crestwood, and hung up on me basically. And I was not okay and I was asking her for help as a human being and she ignored me as well.

Doc. no. 29-1 (Plaintiff dep.), at 162. Plaintiff sent Holtzclaw two lengthy text messages, stating that she had been falsely accused of medication diversion and complaining about Phillips's failure to investigate her June 12 allegations of Simon's targeting and bullying.[70] She also told Holtzclaw that Phillips had retaliated against her.[71]

Plaintiff called the corporate hotline multiple times on July 4, 6, 7, and 8, reiterating her concerns.[72] Her allegations were referred to Lisa Friday, Community

---

[68] *Id*. at ECF 16-17.

[69] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 148. Phillips called Holtzclaw, rather than Brown, because he had her cell phone number. *Id*. at 149.

[70] Doc. no. 29-3 (Plaintiff dep.), defendant's ex. 18, at ECF 8-13.

[71] *Id*. at ECF 11.

[72] Doc. no. 29-14 (Holtzclaw aff.), ex. A (Records of Crestwood Reporting Hotline), at ECF 41-44.

Health Service's Regional Human Resources Director, on July 6.[73]

Plaintiff was notified by Bob Phillips sometime between July 4 and 9 that her drug screen was negative and she could return to work.[74]  On July 9, she sent two email messages to Phillips and Crow, expressing concerns about returning to the weekend split shift.[75]  Her second message stated her fear that discrimination would persist upon her return.  She also asked who would be in charge of her work shifts; whether the "butt smacking" allegations would be investigated further; and, stated an unwillingness to work under either Simon or "the nurse supervisor" who plaintiff had "not met," but "only seen."[76]

Despite her concerns, plaintiff returned to work for her next scheduled shift, but did not report thereafter.[77]  She testified that "nothing changed. . . .  I went back for one shift, and that was the last shift that I ever worked there."[78]

Lisa Friday, David Brown, and Lanette Holtzclaw continued to investigate

---

[73] *Id.* at ECF 41.

[74] Doc. no. 29-1 (Plaintiff dep.), at 176.  Phillips also concluded from the Omnicell audit that "all medications that were pulled by [plaintiff] were documented appropriately as administered," and that plaintiff corrected six discrepancies with another nurse as a witness.  Significantly, he did "not find evidence of diversion in the chart audit of dispensed controlled substance admisistration."  Doc. no. 29-12 (Brown dep.), ex. 3 (July 8, 2020 email from Phillips to David Brown, Susan Bryce, and Lanette Lovett, now Holtzclaw), at ECF 61 (alterations supplied).

[75] Doc. no. 29-3 (Plaintiff dep.), ex. 19, at ECF 14-15.

[76] *See id.* at ECF 16-17.

[77] Doc. no. 29-1 (Plaintiff dep.), at 180.

[78] *Id.* at 180-81.

plaintiff's claims.[79]  Friday corresponded with plaintiff by email on July 16, 2020, and asked her to send information that supported her claim of retaliation.  Friday stated: "I had hoped to have a resolution to your concerns by tomorrow, but I don't have everything you were going to send."[80]  Friday and plaintiff engaged in an extensive text-message exchange between July 24 and August 1, during all of which Friday continued to ask plaintiff to supply additional information.[81]  The chronological order of those messages is not clear, but they reflect that Friday was attempting to assist plaintiff to return to work.  Plaintiff expressed her "mental anguish" about the situation, her desire to have her claims investigated further, and asked what her options were.  On July 27, Friday told plaintiff that she had received the employee interviews, and that all interviewees had spoken highly of plaintiff.  Friday also expressed interest in setting a meeting with plaintiff and Susan Bryce, to discuss plaintiff's weekday availability, since plaintiff had expressed an unwillingness to

---

[79] Doc. no. 29-14 (Holtzclaw aff.), ¶ 9.  In connection with the investigation of plaintiff's complaints, Susan Bryce issued an "Employee Conduct/Disciplinary Action Notice" to Phillips on August 7.  Doc. no. 34-6, at ECF 1-2.  He was cited for "failure to properly execute an investigation into employee concerns"; in particular, his failure to interview the employees identified as potential witnesses.  *Id.* at ECF 1.  He also was criticized for sharing confidential information from the investigation with plaintiff (*i.e.*, that Simon had admitted some of the conduct about which plaintiff had complained).  *Id.*  With respect to the "reasonable suspicion" drug screening process, Phillips did not ensure the confidentiality of the drug screen, as shown by plaintiff's co-workers' knowledge that she was on administrative leave for that reason.  *Id.* at ECF 1-2.  Also, since plaintiff was tested for a reasonable suspicion of being under the influence of a substance, Phillips should not have permitted her to drive herself home.  *Id.* at ECF 2.

[80] Doc. no. 29-3 (Plaintiff dep.), ex. 20, at ECF 24.

[81] Doc. nos. 29-4 & 29-5 (Plaintiff dep.), ex. 23.

work weekends.[82]

During that same timeframe, Brown interviewed eight employees identified by plaintiff as witnesses to her claims of mistreatment by Simon.[83]  Brown asked each employee the following questions: "Are all employees treated with respect in your work area?"; "Have you witnessed any unprofessional conduct in your work area?"; and, "Is the leadership in your work area supportive to all staff members?"[84]  While some of the employees noted tension between plaintiff and Simon, none reported witnessing the conduct of which plaintiff had complained.[85]  Brown later interviewed Alaina Peterson, and recorded her responses to those same questions as follows:

Jessica Ivey is treated differently.  I worked with her at Athens, friends.

Ex. 1) In June a septic patient arrived by ambulance.  When she asked for help, Mallory was heard to say, "Why does she expect us to do all of her work?"

Ex. 2) Aaron asked Alaina if she needed help.  She said no, but Jessica does.  He did not want to help her.

Ex. 3) Jessica could not reconcile drug count.  Tina said, "Why can't you get it right?  You'll need to drug screen."

---

[82] *See* doc. no. 29-5 (Plaintiff dep.), ex. 23, at ECF 26-27.

[83] Doc. no. 29-14 (Holtzclaw aff.), ex. B, at ECF 48-49.  Brown interviewed Bradley Hammond, Kim Jones, Evelyn Cothran, Mila Yarbrough, Karen Morrison, Laura Willingham, and Dr. Wayne Jones.  He left messages for Alaina Peterson and Michelle Fowler on July 24, and attempted to call Erin Vaughn on that same date, but her voice mail box was full.  *Id.*

[84] *Id.*

[85] *Id.*

When I asked Alaina why she thought Jessica was treated differently, she thinks it's because she's new, an outsider.  She can be a little ditsy.

I asked Alaina if she personally was treated differently when she was a new employee.  She said "No."

When asked about departmental leadership, she indicated that Bob [Phillips] is a little standoffish until there's a problem.  She finds John [Crow], Chris [Darnell] and Michelle [LNU[86]] to be more approachable.

Doc. no. 29-14 (Holtzclaw aff.), ex. B, at ECF 50 (alterations and footnote supplied).

Brown forwarded his synopsis of the interviews to Friday.

Susan Bryce met with Tina Simon on July 27 to discuss plaintiff's claims. Significantly, and contrary to the sentiments recorded in Lisa Friday's July 27 message to plaintiff quoted above, Simon stated her desire that plaintiff *not* return to work on Simon's shift.[87]  Bryce sent an email message to Friday documenting the meeting.  Friday asked whether Bryce wished to meet with plaintiff, and Bryce replied as follows:

My honest assessment is that there is nothing that is going to make it better for Jessica.  However, that is not to say that I won't sit down with her.  If you think it would be beneficial, I absolutely would.  She expressed to me that she wants a public apology from Bob and Tina for her having to be drug tested and suspended during the investigation.  That is not going to happen.  Her behaviors clearly dictated that the investigation needed to occur.  Her behaviors since then have not helped

---

[86] "Michelle" is not further identified in the record.

[87] Doc. no. 29-12 (Brown dep.), ex. 5, at ECF 73-74.

28

her.  What do we do next?

Doc. no. 29-12 (Brown dep.), ex. 5, at ECF 73.  Also during this time, Bryce

attempted to contact plaintiff by telephone to make a plan for her to return to work.[88]

Bryce offered plaintiff the option to change shifts or to assume a prospective

position in another department at her same rate of pay or higher, but plaintiff

declined.[89]  Plaintiff only wanted to work in the Emergency Department because that

was her specialty.[90]  She did not want to return to the Emergency Department,

however, unless she received a public apology for the diversion investigation.[91]

On July 30th, Brown sent the following email to Bryce:

> Jessica Ivey sent John Crow (manager) a note indicating that she asked
> if she can work 1:00 p.m. to 7:00 p.m. Friday this week.  Her normal
> shift is 1:00 p.m. to1:00 a.m.  Bob says he can make accommodations
> for the suggested shorter shift if need be, but his more critical need is
> night shift.  She's obviously cutting her normal shift short to illustrate
> an avoidance of Tina.   We are being mindful of the ongoing
> investigation.

Doc. no. 29-12 (Brown dep.), ex. 4, at ECF 63.  Bryce responded:  "I really do not

think it is wise to have Jessica back.  I'd like to finish this up ASAP."[92]  Friday was

---

[88] Doc. no. 29-14 (audio recording of two voicemail messages from Bryce to plaintiff), ex. C, at ECF 51.

[89] Doc. no. 29-1 (Plaintiff dep.), at 92-93, 166-169.

[90] *Id.* at 169.

[91] *Id.*

[92] *Id.*

29

copied in that email chain, and asked "What do you want to do with her?  Term her?"
Bryce responded, "Yes, I would."  Brown asked Friday for her input, and she replied,
"What are we terming her for?"[93]  The record does not contain any further exchanges
on the subject, and plaintiff's employment was not terminated on that date.

Also on July 30, plaintiff sent an email to Tim Hingtgen, CHS's Chief
Operating Officer, advising him of her concerns and her belief that her claims had not
been properly investigated or resolved.[94]  On July 31, Friday informed plaintiff as
follows: "It looks like you have now chosen not to allow me to help and bypassed the
grievance process as well.  I will have an outside party Anne Yuengert who is very
experienced contact you on Monday."[95]  Then, on August 5, plaintiff sent an email
to Friday:

> Hello Lisa, I was wanting to further discuss the shift change with my
> base pay as the hourly amount of what I was making on the 3-3 weekend
> contract.  I can not at this time state a permanent schedule.  But I can
> work Fridays day shift 7a7p with whatever I would of [sic] made
> working 3-3 as my base pay.  I am looking to see if Monday - mid shift
> and possibly Tuesday mid shift pending child care.  I do not wish to
> work in the same hostile environment thus would mean not working as
> part of the night shift weekend crew.  I take pride in being an employee
> there & all I have wanted and continue to want is no special treatment

---

[93] Doc. no. 29-12 (Brown dep.), ex. 4.

[94] Doc. no. 29-6 (Plaintiff dep.), ex. 26.

[95] Doc. no. 29-4 (Plaintiff dep.), ex. 23, at ECF 20.  Anne R. Yuengert is an experienced
attorney and partner in the law firm of Bradley Arant Boult Cummings LLP, based in Birmingham,
Alabama.  She was engaged by Crestwood to provide legal advice regarding plaintiff's complaints.
Doc. no. 29-13 (Yuengert dep.), at 9.

but just to be treated equally to my peers.  I'm unsure about department changes as I'm unsure of the options.  Please let me know.

Also — I was willing to work since I've been told to stay home – is this unpaid or paid?  Administrative or disciplinary leave?  Thanks for your time look forward to hearing from you.  Jessica Ivey

Doc. no. 29-7 (Plaintiff dep.), defendant's ex. 34, at ECF 27.  The record contains no response from Friday.

Yuengert contacted plaintiff by telephone to determine what she was seeking, in an attempt to formulate options.[96]  After listening to plaintiff's concerns about returning to her previous shift, Yuengert told plaintiff she would find out whether those concerns could be accommodated.[97]

Yuengert called plaintiff a second time.[98]  She confirmed that plaintiff was on administrative leave without pay, but her benefits would be covered.[99]  She advised plaintiff:

I have looked through all the investigations.  Crestwood has thoroughly investigated all your allegations, and they didn't find anything to support your belief you've been discriminated against or that your patients had been isolated or mistreated.

So then you said you can't work with Tina Simon, and Crestwood doesn't believe it would be constructive for you and Tina to work

---

[96] *Id.* at 20.

[97] *Id.* at 25.

[98] *Id.* at 31.  The dates of the telephone calls are not contained in the record.

[99] *Id.* at 31-32.

together.

     Given your statements about your concerns about your safety and your — that the environment and your perceptions about your co-workers, Crestwood doesn't have a position it thinks that it can work — that you can work effectively in and wants to give you the opportunity to find a place you think will be more suitable.

     [Yuengert also proposed the following severance agreement:] They're willing to give you — to pay you six weeks of severance to do that.

     During that six weeks, they will pay you your salary and your share — they will cover your health insurance during that time. Consistent with that practice, they have a written severance agreement and I can send you what that looks like for you to consider, okay?

Doc. no. 29-13 (Yuengert dep.), at 32-34 (alteration supplied).  Plaintiff asked Yuengert to send a copy of the proposed agreement by email.[100]

On August 19, plaintiff sent an email message to Yuengert, with the subject line "Proposal."[101]  Plaintiff wrote:

I am waiting on my attorney to review and consult me.  He stated I'd possibly be able to meet next week.  In the meantime I attempted to file for unemployment and it is stating that my employer is stating that I was separated due to misconduct — or something along those lines.  I'm unsure how the whole unemployment process really works as I've never been in this situation.  Can you give me more insight on this and because I was not let go for misconduct I am trying to understand what I can do financially in the time [remainder of message is cut off].

---

[100] *Id.* at 34.

[101] Doc. no. 29-6 (Plaintiff dep.), defendant's ex. 29, at ECF 19.

Doc. no. 29-6 (Plaintiff dep.), ex. 29, at ECF 19-20.  Yuengert replied:

> I checked with Crestwood and they have not yet terminated your employment and only just now received your UI [Unemployment Insurance] claim (so have not responded to it).
>
> As I understand it, Crestwood is not intending to contest your unemployment claim.  What did you tell the Unemployment folks about why you were not working?

*Id.* at ECF 21.  The record contains no response from plaintiff, but she emailed Yuengert the next day, August 20: "Anne, Sorry to message once more.  If I won't get an answer today let me know an estimate on when I will know what to prepare for if you don't mind as I will have to plan accordingly for my family and myself.  Thanks, Jessica."[102]  Yuengert replied:

> As I said before, Crestwood has not told Unemployment that you were terminated for misconduct.  Also, as I noted before, Crestwood had not terminated your employment.
>
> Given that you have applied for unemployment benefits, Crestwood plans to report (and may have reported) that you were discharged for lack of work, which should not suggest any sort of misconduct and is likely to result in you receiving benefits (although that decision is up to Unemployment, not Crestwood).

Doc. no. 29-7 (Plaintiff dep.), defendant's ex. 29, at ECF 1.

Crestwood's records reflect that Human Resources Manager Lanette Holtzclaw (*née* Lovett) advised plaintiff that she had "until 9/1/2020 to sign and return the

---

[102] *Id.* at ECF 22.

separation/severance agreement offered by the facility."  Plaintiff did not do so and

was terminated due to no available work.[103]

Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission on September 23, 2020.  Her charge reads in full:

> I was formerly employed by Crestwood Hospital as an Emergency Room nurse.  I began my employment in or around March, 2020.  Almost immediately I began to suffer discrimination based on race at the hands of my immediate supervisor and, when I complained of said discrimination, I was suspended from my role and subsequently terminated.
>
> I believe I was discriminated and retaliated against, and terminated, in violation of Title VII of the Civil Rights Act.  I am filing this Charge on behalf of myself and all others similarly-situated.

Doc. no. 1 (Complaint), ex. A.  The EEOC issued a "Dismissal and Notice of Rights"

on May 6, 2021, stating that it would

> not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute.  This does not mean the claims have no merit.  This determination does not certify that the respondent is in compliance with the statutes.  The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

*Id.*, ex. B.  This action was filed on July 30, 2021.

## II.  DISCUSSION

### A.    Disparate Treatment (Termination)

---

[103] Doc. no. 29-14 (Holtzclaw aff.), ex.A (Records of Crestwood Reporting Hotline), at ECF 12 (alterations supplied).

The first count of plaintiff's complaint, based upon 42 U.S.C. § 1981,[104] contends that her employment was terminated "because of her race."[105] She does not provide direct evidence of discrimination. Accordingly, she must prove her claim with circumstantial evidence, navigating the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequently augmented in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[106] Under that framework, plaintiff must first establish a *prima facie* case of disparate treatment. If plaintiff does so, that gives rise to a presumption of discrimination, which the employer must rebut by articulating a legitimate,

---

[104] The relevant subsections of the statute cited in text read as follows:

(a) Statement of equal rights

    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

[105] Doc. no. 1 (Complaint), ¶¶ 57, 59, at ECF 7.

[106] Those cases arose under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* but the same framework applies to claims bottomed upon Section 1981. *See, e.g.*, *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 919 (11th Cir. 2018).

nondiscriminatory reason for the disputed employment action.  If the employer satisfies its burden, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

To establish a *prima facie* case of disparate treatment based upon plaintiff's race, she must show:  (1) that she is a member of a protected class (*e.g.*, an American citizen of Korean or other Asian heritage); (2) she was subjected to an adverse employment action (*e.g.*, she was terminated); (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified to perform the duties of the employment position from which she was terminated.  *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

Plaintiff failed to establish the third element of a *prima facie* case:  *i.e.*, that similarly situated employees outside her protected class were treated more favorably. In order to satisfy that element, a plaintiff must identify a comparator who is "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1224.  Plaintiff, however, did not identify *any* comparator, much less one who was similarly situated. Accordingly, summary judgment is due to be entered on Count I.

**B.     Hostile Work Environment Claims**

Plaintiff's hostile work environment claims are asserted under both Title VII and 42 U.S.C. § 1981.  The second count of her complaint, entitled "Title VII Race Hostile Work Environment," reads as follows:

61. Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set out herein.

62. Tina Simon harassed Ivey because of her race.

63. Simon,[*sic*] was in a leadership position, able to take tangible employment actions concerning the terms and conditions of Ivey's employment, including lunch scheduling and work assignments.

64. Simon's harassing behavior included racial comments, [*sic*]

65. Simon's harassing conduct included unconsented physical touching.

66. Simon's harassing conduct included changing Ivey's lunch schedule, while allowing employees who were not Asian to schedule their own lunches.

67. Simon's harassing conduct included assigning Ivey more laborious work and forbidding other nurses from helping Ivey with her patients when it was common practice for nurses to help each other.

68. The harassment altered the terms and conditions of Ivey's employment and created a hostile work environment for Plaintiff.

69. Ivey reported Tina Simon's harassing behavior to John Crowe [*sic*], Chris Darnell, and Bob Phillips.

70. Mr. Crowe [*sic*], Mr. Darnell and Mr. Phillips failed to take prompt remedial action to remedy the harassment.

37

71. Ivey suffered damages because of the hostile work environment including loss of pay, benefits, and mental anguish.

Doc. no. 1 (Complaint), ¶¶ 61-71, at ECF 7-8.

The third count of plaintiff's complaint is entitled "42 U.S.C. § 1981 Hostile Work Environment," and the substantive allegations comprising that claim are verbatim copies of the allegations contained in Count II above; only the paragraph numbers changed.[107]

A *prima facie* racially hostile work environment claim requires proof of five elements:  (1) the plaintiff belongs to a protected class or racial group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon the plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment, and created a discriminatorily abusive working environment; and (5) plaintiff's employer is liable for the environment under a theory of either direct or vicarious liability.  *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

It is vitally important to note that neither Title VII nor § 1981 prohibits "all verbal or physical harassment in the workplace"; rather, both statutes are directed "only at 'discriminat[ion] . . . *because of* . . . [race].'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis and ellipses supplied, first alteration

---

[107] See *id*. ¶¶ 72-82, at ECF 8-9.

in original, second alteration supplied).

Indeed, neither Title VII nor § 1981 "protect employees from all unpleasant and rude conduct in the workplace." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999) (Edmondson, J., concurring).  In other words, "unfair treatment of an employee, standing alone, does not make out a Title VII [or § 1981] case; *the mistreatment must be because the employee was* [*Asian-American*]." *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (alterations and emphasis supplied).

The "critical issue," according to the Supreme Court, "is whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)) (alterations supplied).

Determination of whether a plaintiff has satisfied the fourth element of a *prima facie* case — that the harassment complained of was either sufficiently severe or pervasive as to alter the terms and conditions of her employment — entails both a subjective and objective analysis.  *Reeves v. C.H. Robinson, Inc.*, 594 F.3d 798, 808-09 (11th Cir. 2010); *Mendoza*, 195 F.3d at 1246.  The employee must subjectively perceive the harassment as sufficiently severe or pervasive to alter the

terms or conditions of her employment, and that subjective perception must be objectively reasonable. *Reeves*, 594 F.3d at 809 (citing *Mendoza*, 195 F.3d at 1246). "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Reeves*, 594 F.3d at 809 (quoting *Harris*, 510 U.S. at 22). The objective component is a fact intensive inquiry — which requires viewing the harassment "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23).

The Supreme Court has said that the following four factors should be considered in determining whether the harassment complained of objectively altered an employee's terms or conditions of employment:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's job performance. *Harris*, 510 U.S. at 23; *Clark County School District v. Breeden*, 532 U.S. 268, 270-271(2001); *Reeves*, 594 F.3d at 808; *Mendoza*, 195 F.3d at 1246.  A determination that the harassment complained of was *either* sufficiently pervasive (as in its frequency) *or* severe is sufficient to establish a violation of Title VII.  *Reeves*, 594 F.3d at 808.

Both of plaintiff's racially hostile work environment claims are based upon the

allegations that Tina Simon subjected her to an offensive racial comment about the origin of the COVID virus, "smacked her on the butt," required her to take lunch breaks at a time of Simon's choosing, imposed work assignments that were more laborious than those assigned to other staff nurses, and instructed other staff nurses to not assist plaintiff.[108]

Plaintiff offers scant evidence that she was subjected to an actionable, objectively hostile work environment. She testified that Simon, on one occasion, commented that "the China virus" originated from "your people," and rolled her eyes in plaintiff's direction.[109] Simon was not questioned about that comment during her deposition, but testified that she did not know plaintiff's racial identity until this action was filed. Notably, plaintiff did not include the comment in her initial June 12 email complaint, the July 3 email to Phillips and Crow reiterating acts of perceived discrimination, any subsequent communication with Crestwood or Community Health Systems personnel, or the charge of discrimination filed with the Equal Employment Opportunity Commission.[110] However, even assuming that Simon made the racially insensitive comment, "isolated remarks alone are not sufficient to create a severe [or] pervasive work environment." *Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972,

---

[108] Doc. no. 1 (Complaint), at ECF 7-8.

[109] Doc. no. 29-1 (Plaintiff dep.), at 81, 83.

[110] See doc. no. 1 (Complaint), ex. A (EEOC Charge of Discrimination), at ECF 15-16.

982 (11th Cir. 2015) (alteration supplied).

Additionally, plaintiff presents no evidence that the other conduct complained of occurred because of her race.  When asked in deposition why she believed the perceived mistreatment was racial harassment, she stated:  "Nobody said that to me. I knew that I showed up and I was a minority and I was treated differently than everyone else based upon my race."[111]  She also stated:  "From the first instant I worked on a shift with Tina, I felt I was singled out, I was not part of the team, I was blatantly treated differently.  And in my mind, I'm the minority of the group, so I felt like that was what that was related to."[112]

Apart from plaintiff's subjective beliefs, there is simply no *objective* evidence to support her view that the conduct she complains of was attributable to her race, or Korean heritage.  Her contention that she was treated "differently" because she was the only "minority,"[113] without more, does not support her claim that she was subjected to a racially hostile work environment.  After viewing the totality of the record evidence in the light most favorable to plaintiff, the court cannot conclude that she suffered harassment that was sufficiently severe or pervasive as to alter the terms or

---

[111] Doc. no. 29-1 (Plaintiff dep.), at 77.

[112] *Id.* at 78-79.

[113] One of plaintiff's co-workers, Alaina Peterson, told Brown that plaintiff was treated differently.  Peterson elaborated that she believed plaintiff was treated differently because she was a new employee.  Doc. no. 29-14 (Holtzclaw aff.), ex. B, at ECF 50.

conditions of her employment.  Hence, summary judgment is due to be entered on Counts II and III.

## C.    Retaliation Claims

Plaintiff alleges in the final two counts of her complaint that her employment was terminated in retaliation for her protected activity of complaining about Simon's purported racial harassment.  Count IV is based upon Title VII, and Count V upon 42 U.S.C. § 1981.  The substantive allegations of the paragraphs comprising each are — like the second and third counts discussed previously — identical; only the paragraph numbers change.[114]

Title VII explicitly protects employees who oppose or participate in activities to correct an employer's discriminatory practices:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (ellipsis and alteration supplied).  The statute recognizes two predicates for retaliation claims:  one based on retaliation for *opposing* discriminatory practices, and another based on retaliation for *participation* in protected activity:

---

[114] *Compare* doc. no. 1 (Complaint), ¶¶ 83-96, at ECF 9-11 ("Count IV - Title VII Retaliation") *with id*. ¶¶ 97-111, at ECF 11-12 ("Count V - 42 U.S.C. § 1981 Retaliation").

43

> *Under the opposition clause*, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, *under the participation clause*, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (emphasis supplied, citations omitted).

Plaintiff's complaints to Bob Phillips fall under the "opposition clause" of the anti-retaliation statute.  To prevail on such a claim, plaintiff must show that she "subjectively believed that [Crestwood] engaged in unlawful discrimination and that 'h[er] belief was *objectively* reasonable in light of the facts and record present.'" *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in original)).  Here, there is no doubt that plaintiff subjectively believed that Crestwood unlawfully discriminated against her, and Crestwood's concession that plaintiff engaged in protected activity[115] obviates the need for the court to determine whether that belief was objectively reasonable.

In addition to showing that she participated in protected activity, a plaintiff must

---

[115] Doc. no. 35 (Defendant's Reply in support of Motion for Summary Judgment), at 35 n.2 ("Crestwood concedes that Plaintiff engaged in protected activity when she complained that she believed she was subject to race discrimination.  This includes only her June 12, 2020 email, one of her many hotline calls, one of her many text messages to Friday, and her June 30 email to [Community Health Systems]'s [Chief Operating Officer].").

establish that she suffered a "materially adverse" action, and that the adverse action was causally related to her opposition to an allegedly unlawful employment action. "[T]he key word in the opposition clause is 'opposed.'" *Patterson v. Georgia Pacific, LLC*,  38 F.4th 1336, 1347 (11th Cir. 2022) (Carnes, J.); *see also, e.g.*, *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).

Moreover, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington Northern and Santa Fe Railway*, *v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006) (in turn quoting *Washington v. Illinois Department of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  The Supreme Court established an objective standard to "avoid[ ] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Burlington Northern*, 548 U.S. at 68 (alteration supplied).  The Court emphasized that "[c]ontext  matters" when determining the materiality of the challenged action, offering the following examples:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement

might well deter a reasonable employee from complaining about discrimination.

*Id.* at 69.  As the Seventh Circuit observed in *Washington*, the case relied on in part by the Supreme Court when establishing the relevant standard, a materiality requirement is necessary because "almost every worker feels offended or aggrieved by many things that happen in the workplace, and sorting out which of these occurred because of race, sex, religion, national origin, or a complaint about any of these would be an impossible task." *Washington*, 420 F.3d at 660.

Finally, a plaintiff must proffer evidence that the "desire to retaliate" against the protected activity was the "but-for cause" of the adverse action.  *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013).  Causation may be shown by a close temporal proximity between the protected activity and the adverse action.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  "But mere temporal proximity without more, must be 'very close.'" *Id.* (quoting *Breeden*, 532 U.S. at 273).

If a plaintiff establishes each of the elements of a *prima facie* case, the defendant must proffer a legitimate, non-discriminatory reason or reasons for taking the adverse action.  *See Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022).  "If the employer does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." *Id.*

46

### 1. Termination

Crestwood argues that plaintiff's employment was not involuntarily terminated and, consequently, she cannot establish that she was subjected to an adverse employment action. Crestwood also argues that, in any event, plaintiff cannot show a causal connection between the termination of her employment and her complaint of race discrimination.

The court disagrees with the first contention. Plaintiff's employment *was* terminated, although not in the usual way. When plaintiff was notified that she had been cleared to return to work, she expressed to Phillips and Crow her concern that her complaints had not been resolved, and that she did not feel comfortable in continuing to work with Simon. She returned for one shift, but did not report to work thereafter. Lisa Friday engaged plaintiff in an attempt to find a resolution, but plaintiff refused to work a different shift or to transfer to another department, even at a higher rate of pay. Friday then put the onus on plaintiff to determine the options. While plaintiff offered to work from 1:00 p.m. until 7:00 p.m. (half of a shift) on weekends, such a schedule was not acceptable to Crestwood, given staffing demands for night shift workers.[116] Plaintiff also demanded an apology from Crestwood for requiring her to submit to a drug screen as a condition of returning to work — a demand Crestwood

---

[116] Plaintiff contends that Crestwood "blocked" her from returning to work, but the evidence does not support that contention.

rejected.   When an impasse was reached, Crestwood offered plaintiff severance pay, which she constructively rejected by not accepting the agreement.   At that point, Crestwood administratively terminated her employment.[117]   Under those unique circumstances, the court concludes that plaintiff has shown that she suffered a materially adverse action.

As for causation, however, plaintiff argues only that she "*attempted* to return to work in a shift that did not require her to work with her harasser, and Defendant refused."[118]   That conclusory assertion does not establish that plaintiff's complaint of discrimination was the "but-for cause" of Crestwood's termination of her employment. Rather, the record supports a finding that plaintiff's employment was eventually administratively terminated nearly three months following her initial June 12, 2020 complaint, and two months after the July 3 drug screen, because she did not cooperate with Crestwood's efforts to assist her return to work following the negative drug screen.[119]

## 2.   Drug screen

The court must determine whether plaintiff has shown that being required to

---

[117] Plaintiff's behavior could be characterized as a "constructive resignation," but as a factual matter, Crestwood terminated her employment.   *See* doc. no. 29-14 (Records of Crestwood's reporting hotline), at ECF 12.

[118] Doc. no. 34 (Plaintiff's Response in Opposition to Motion for Summary Judgment), at 38-39 (emphasis supplied).

[119] *See* doc. no. 29-14 (Records of Crestwood's reporting hotline), at ECF 12.

submit to a drug screen was a "materially adverse" action.  Crestwood argues that it was not, because plaintiff was paid for the time she was suspended while awaiting the result of the drug screen.  While that assertion is true and relevant, it does not end the inquiry. *Burlington Northern*, 548 U.S., at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.") (alteration supplied).

Plaintiff makes four arguments that the drug screen was, as to her, "materially adverse."  First, she contends that her status as a nurse whose license could be jeopardized by a drug screen made the requirement that she submit to such a test "materially adverse."  Second, she argues that the manner in which the drug screen was conducted — *i.e.*, that confidentiality was not maintained — made the requirement "materially adverse."  Third, she contends that there was no basis for the drug test to be administered.  Finally, she argues that the drug test and corresponding suspension ultimately triggered her termination.[120]

Plaintiff offers no evidentiary support for her first argument.  While *positive* drug screen results *could* jeopardize her, or any nurse's, license, merely being required to submit to a drug screen does not, alone, pose any jeopardy.  Moreover, the results of plaintiff's drug screen were negative, she was cleared to return to work, and her pay

---

[120] Doc. no. 34 (Plaintiff's Response in Opposition to Motion for Summary Judgment), at 36-37.

was restored.

Plaintiff next argues that the manner in which the drug screen was conducted was a materially adverse action. Plaintiff has presented evidence that Phillips's handling of the matter was not ideal, as the confidentiality of the drug screen was not maintained. Phillips was disciplined for his failure to safeguard the confidentiality of the drug screen, in addition to other actions he took in connection with plaintiff's complaint. Even so, plaintiff has not described how a reasonable juror would reach the conclusion that this action was materially adverse, and does not cite any authority for her argument. Accordingly, the court cannot conclude that the breach of confidentiality was "materially adverse," such that a reasonable worker would be dissuaded from making or supporting a charge of discrimination.

Plaintiff also contends that Crestwood had no basis for requiring a "reasonable suspicion" drug screen, but this argument implicates causation, rather than whether requiring the test was a "materially adverse" action.

Plaintiff next challenges Phillips's reliance on his perception of her behavior, her co-workers' reports, and, his review of her drug "miscounts." She asks the court to disregard the co-workers' reports as hearsay, because "[d]efendant has not produced these alleged reports or offered testimony or statements from the coworkers in

question."[121]  Defendant counters that Phillips's summaries of the conversations were produced; but, and more importantly, the statements were not offered for the truth of the matter asserted and, therefore, technically are not "hearsay."[122]  The court agrees with defendant that the statements are not hearsay, but instead are offered to show that Phillips believed that a drug test was warranted.  In addition to the statements, Phillips reviewed the Omnicell medication management system and determined that there were a number of discrepancies attributable to plaintiff.  Plaintiff's behavior, both in person and via her email messages to him, also concerned Phillips.  Phillips relayed his findings and perceptions to Susan Bryce, Chief Nursing Officer, and David Brown, Director of Human Resources, and advised them of plaintiff's prior complaint of mistreatment and discrimination, albeit for the first time.[123]  Bryce and Brown concurred that a "reasonable suspicion" drug test was appropriate.[124]  Defendant has provided the basis for its decision, which the court cannot second-guess.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*) (explaining that federal courts "do not . . . sit as a superpersonnel department that reexamines an entity's business decisions").  Accordingly, plaintiff cannot establish a causal connection between her complaint of discrimination and the drug screen.

---

[121] *Id.* at 40.

[122] Doc. no. 35 (Defendant's Reply in Support of Motion for Summary Judgment), at 2 n.1.

[123] Doc. no. 29-9 (Phillips Sept. 23, 2022 dep.), at 82.

[124] *Id.* at 116.

Finally, plaintiff attempts to bootstrap the drug screen into an adverse action by arguing that the screen "triggered" her termination.  As discussed in the previous section, plaintiff has not established a *prima facie* case that her termination was in retaliation for her complaint.  Thus, her argument fails.

### III.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted.  A separate judgment will be entered contemporaneously herewith.

**DONE** this 9th day of May, 2023.

_____
Senior United States District Judge